Filed 2/28/13  P. v. McPeters CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY ORYAN McPETERS,<br><br>    Defendant and Appellant. | B238758<br><br>(Los Angeles County<br>Super. Ct. No. SA063427) |

_____

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia Rayvis, Judge.  Reversed in part and affirmed in part as modified.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant appeals his conviction for one count of second degree murder (Pen. Code, § 187) and one count of sexual contact with human remains (Health & Saf. Code, § 7052, subd. (a)).  On appeal, he contends that (1) the trial court erred in excluding evidence of the victim's prior aggressive and violent behavior toward him, (2) insufficient evidence supports his conviction on count 2 because there was minimal independent evidence, aside from his statement to the police, of the corpus delicti, (3) the prosecution failed to disclose evidence material to the defense pursuant to *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (*Brady*), requiring reversal of his conviction on count 1, and (4) the sentencing order and abstract of judgment must be corrected to reflect the imposition of a single parole revocation fine and a single restitution fine.  We reverse defendant's judgment of conviction on count 1, affirm his conviction on count 2, and modify the judgment to reflect the correct imposition of parole revocation and restitution fines.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant and the victim, Aneesah Akbar (Akbar), were both in the Navy and met while they were stationed on the East Coast.  They were involved in a dating relationship. On March 10, 2007, Laylah Akbar, the victim's sister, spoke to Akbar about a birthday party, which was planned for March 11, 2007.  When Akbar did not arrive for the birthday party, Laylah Akbar called her all day until about midnight, but did not get an answer.

### 1. *Defendant's Statement to Police: Testimony of Deputy Cooper*

Los Angeles Sheriff's Deputy Howard Cooper interviewed defendant on March 15, 2007, the day after his arrest.  Defendant told Deputy Cooper that on the evening of March 11, 2007, he and Akbar went out to have some drinks at Houston's. They went back to Akbar's apartment, and defendant went to a store around the corner to buy more liquor.  At the store, defendant was attacked by a man, causing defendant to drop his bottle of alcohol.  Defendant went back to Akbar's apartment, and when he told her about it, she said, "Oh, you know, you got robbed or whatever" and "You have bitch

2

written across your face." Akbar told him to leave and grabbed at him. Defendant responded that he had come a long way to see her, and asked her why she was telling him to leave. Defendant grabbed Akbar around the neck and started choking her. Akbar resisted and scratched defendant on the face and elbow. After about a minute, Akbar went limp. Defendant tried to give her mouth-to-mouth resuscitation and told her to wake up. She was wheezing and at first she was breathing shallowly, but eventually she stopped breathing. Defendant laid her flat on the bed on her back. Akbar was wearing her shirt and underwear. He tried to resuscitate her for about 20 minutes, and did a chest compression. He shocked her with a Taser, she twitched but did not respond, but defendant did not call 911. At that time, defendant knew she was dead. Defendant stayed in her apartment another 40 minutes, crying. Defendant removed Akbar's panties and had sex with her. He did not use a condom, and wiped the semen off her with toilet paper. Afterwards, he covered her and left.

After he left, defendant drove around for awhile and went to his sister Myole's house in San Jacinto. He told her what had happened. She told him he needed to turn himself in. At around 8:00 a.m. the next morning, defendant left to go to his other sister Cruesa Gilmore's house in San Diego. When he got there, he told her what had happened, and she also told him to turn himself in. Defendant left and went to a hotel and started drinking. He tried to overdose on some Motrin and tried to slash his wrists. Gilmore came and got him at the hotel because she wanted to take him to see a psychiatrist on the Navy base on Coronado Island. As they were driving, defendant got out of the car on Coronado Island and walked away. The next day, defendant tried to see his counselor on the base, but his counselor was not available. Defendant hitched a ride and went to his cousin Devon's house in Moreno Valley, where he spent the night. The next day, defendant left and went to another hotel, where police arrested him.

Defendant told police he choked Akbar because he wanted her to stop abusing him and stop being rude.

3

At the time Deputy Cooper interviewed defendant, he observed that defendant had a "Mohawk" haircut, but unlike the usual Mohawk style cut, which went from front to back, defendant's hair was a stripe that went from ear to ear, about two inches long. A photograph taken at the time depicted the right side of defendant's face, which showed a scratch running from the corner of his right eye to the front edge of his right ear. Defendant received this scratch when he was choking the victim. Defendant told Deputy Cooper that he placed his right arm around Akbar's neck, placed the crease of his elbow in front of her throat and while she struggled to break free from his grasp, she scratched defendant. Defendant also had scratches on his wrist, some of which were self-inflicted injuries that were suicide attempts. Defendant did not require stitches or other medical attention for his injuries.

### 2. Defendant's Flight and Arrest: Testimony of Cruesa Gilmore

Gilmore lived in San Diego with defendant. On March 11, 2007, defendant came home between 11:00 a.m. and 2:00 p.m. Defendant told her he had done something terrible, and admitted he had killed Akbar by choking her. Defendant told Gilmore that he was going to turn himself in, but first he was going to go see the therapist who had been treating him for what Gilmore believed was depression. Gilmore left to have lunch with her relatives, and returned at around 5:00 p.m. or 6:00 p.m. Defendant was no longer there. Gilmore believed that he had turned himself in. However, around 9:00 p.m. one of Gilmore's sisters called asking if Gilmore knew where defendant was, and Gilmore's sister was concerned that defendant might hurt himself. Gilmore learned that defendant was at a nearby hotel, and she called the hotel. Defendant sounded intoxicated. Gilmore was afraid defendant might hurt himself. The hotel clerk would not give out defendant's room number, so Gilmore tried defendant's cell phone several times. Finally, one of Gilmore's sisters located defendant and gave Gilmore the room number.

Gilmore went to defendant's hotel room and found him packing. She saw a "big bottle of pills," which she believed were strong painkillers like ibuprofen, and she took the bottle, as well as a knife. There was a large bottle of tequila in the room that was

4

half-consumed. Defendant was very upset and was crying. They went to defendant's rental car and Gilmore started to drive towards the naval base, with defendant directing her. Gilmore saw what looked like a large welt on defendant's chest.

Defendant said, "'I could have stopped it, but I didn't.'" They had driven onto Coronado Island when Gilmore realized that defendant thought they were going to the doctor's office, not the naval base. They came to a traffic light and defendant jumped out of the car staying, "'I can't live with this.'" Defendant ran away.

3. *Police Investigation; Medical Examiner's Report: Testimony of Dr. James Ribe*

Police found Akbar lying on her bed on her stomach, nude from the waist down. Her panties were above her knee on her right leg, and her legs were crossed at the ankles. There was a stain on the bedding in the center of the bed near the victim's waist and hip area. Akbar had four taser or stun gun marks on her buttocks. The victim was five feet, nine inches tall and weighed 141 pounds. Defendant is over six feet tall and weighs in excess of 200 pounds.

Dr. James Ribe, the medical examiner, testified that when found, Akbar was in an early stage of decomposition, and had been in a face-down position for more than a day. No injury was observed in the victim's vaginal or genital area. Dr. Ribe did not testify whether sperm was found in the victim's vagina, and stated it is not possible to determine whether any sperm deposited into the vagina was left before or after the victim's death. The victim had white froth coming out of her nose, which indicated her brain had been starved of oxygen. She also had a large contusion on the back of her head. Dr. Ribe observed that the victim had "air trapping," or expanded lungs, which can result from a blockage of the airway, causing the person to struggle for breath. Akbar died from asphyxiation; neck trauma was a partial cause of asphyxia.[1] He pointed out that where

---

[1] Dr. Ribe testified Akbar died from "[a]sphyxia due to neck trauma and other unascertained factors is what we diagnosed." This differs from the autopsy report which states that Akbar died from neck trauma.

5

asphyxia occurs due to neck compression, sometimes injuries are seen inside the neck, and sometimes there is petechia (hemorrhages) of the eyes and face. When a choke hold is used to compress the neck, there is often no injury inside of the neck. If the choke hold is constant, there will be no petechia because the blood pressure in the head does not change. Finally, the victim's blood was nearly black and had no clots, which is consistent with strangulation. According to Dr. Ribe, it takes from four to six minutes to die from asphyxia. The coroner's report stated that Akbar died from neck trauma and other undetermined factors, and did not list "asphyxia" as the cause of death. The victim had no other fatal injuries; the only evidence of neck trauma is a nail mark on the victim's neck. Finally, he stated that any alcohol in Akbar's blood did not contribute to her death.

A taser is a hand-held electronic device commonly used by law enforcement. The taser shoots darts that embed in the target and emit electronic pulses that incapacitate the person. A taser is shaped like a handgun.

### 4. *Prior Incident of Domestic Violence: Testimony of Deputy Farr*

On October 15, 2006, Deputy Sheriff Bradley Farr responded to a domestic violence call at an apartment in Lemon Grove, in San Diego County. The door was answered by Akbar, who was crying. Deputy Farr observed some redness on her neck. Defendant came out of the bathroom, and Deputy Farr went into the bedroom to speak to defendant. Defendant did not have any visible injuries on him. Defendant told Deputy Farr that he had just returned from Perris and was attempting to study for a test. Akbar had the television on very loud. Defendant became angry and turned the television off. Akbar turned the television back on, and defendant shut off the power at the circuit breaker. Akbar yelled at defendant, threw some food at him, and hit him on the head. Defendant grabbed Akbar by the neck, pushed her down on the couch, and told her to be careful. Defendant released Akbar and called the sheriff's department.

Defendant told Deputy Farr he had taken refuge in the bathroom because Akbar was hitting him. Defendant claimed that Akbar had taken $70 from his wallet. Deputy

6

Farr arrested defendant for a domestic violence offense, and took defendant to the sheriff's station. Defendant gave Deputy Farr the same explanation of the altercation as he had given Deputy Farr at Akbar's apartment. Deputy Farr heard defendant tell one of the nurses that he felt like killing himself. As a result, Deputy Farr took defendant to the hospital for psychiatric evaluation. After defendant spoke to a doctor, he was released back to Deputy Farr, who took defendant back to jail. Deputy Farr took several pictures of defendant because defendant claimed that Akbar had hit him three or four times on the face. There was a black dot on defendant's lip, but it did not appear to be an injury.

The jury found defendant guilty of second degree murder on count 1, and guilty of sexual contact with human remains on count 2. The trial court sentenced defendant to an aggregate term of 17 years to life on both counts.

## DISCUSSION

### I. Evidence of Victim's Prior Aggressive Behavior

Defendant argues the trial court erred in refusing to permit the defense to elicit testimony regarding Akbar's pattern of recurrent violence towards him in support of his theory of provocation. This evidence would have shown Akbar was possessive and jealous of defendant and constantly acted to provoke him. He argues that provocation can occur over a considerable time period, and exclusion of the evidence left only defendant's statement to Deputy Cooper after his arrest to establish provocation.

#### A. *Factual Background*

During trial, when examining defendant's sister Cruesa Gilmore, defense counsel attempted to ask her about Akbar's abusive behavior toward defendant. Counsel asked Gilmore about a family trip that she attended with defendant and Akbar where she observed them arguing a lot. At a sidebar conference, after the prosecution objected to the evidence on relevance grounds, defense counsel advised the court that Akbar consistently provoked defendant and that Akbar was possessive and jealous. Defense counsel stated that Gilmore would testify that when defendant lost his phone on one occasion, Akbar called Gilmore every 10 minutes trying to find defendant. Further,

7

Akbar consistently cursed at defendant and berated him, and defendant's drinking increased after he met Akbar. The prosecution argued there was no relevance to these events because they did not affect what happened at Akbar's apartment the night she was killed. The court agreed and excluded the evidence of Akbar's prior behavior toward defendant.

After Gilmore finished testifying, the court mentioned that Evidence Code section 1103 "talk[ed] about character evidence of the crime victim." After defense counsel advised the court Gilmore had been excused, the court mentioned that Gilmore had two sisters. Defense counsel stated that one of them had not met defendant, and the other sister likely had no information, and counsel would not want to "ask her cold on the stand." The trial court suggested that counsel "ask her outside the presence of the jury and see if there's anything to that." The prosecution stated that Gilmore had told her that Gilmore had not witnessed physical violence between defendant and Akbar, and "I'm unaware of any physical violence between the parties that was observed by anyone on either side, but I do have her contact phone number and I can provide that to counsel or call her[2] together with counsel during lunch." There is no indication in the record whether defense counsel interviewed Akbar's sisters, and whether the interview was fruitful.

The court instructed the jury with CALCRIM 570, voluntary manslaughter and the meaning of heat of passion.

After defendant's conviction, he filed a motion for new trial, alleging as one of the bases for the motion the court's exclusion of Akbar's prior behavior. Defendant relied on *People v. Wharton* (1991) 53 Cal.3d 522 for the proposition that "legally adequate provocation could occur over a considerable period of time." (*Id*. at p. 571.) He argued that similar to the defendant in *Wharton*, his anger and pent-up frustration from his ongoing dysfunctional relationship with Akbar could constitute sufficient provocation to reduce his crime to manslaughter. The trial court erred, defendant argued, because not

---

[2] The record is unclear whether "her" refers to Gilmore or her sister.

only was he unable to put on Gilmore's testimony, but based on the court's ruling, he refrained from calling other witnesses who would testify to Akbar's abuse of him. The prosecution countered that sufficient evidence of provocation existed in the form of defendant's statement to Deputy Cooper, and other than Gilmore's observation of Akbar's series of phone calls to defendant, defendant offered no further evidence of what would be offered to demonstrate provocation; in any event, the trial court had given an instruction on voluntary manslaughter, which distinguished this case from *Wharton*.

At the hearing on the motion, the court commented that *Wharton*, *supra*, 53 Cal.3d 522 involved the psychotherapist-patient privilege and did not control the issue. Further, Deputy Farr's statement concerning a prior argument over the volume of the television during which Akbar threw food at defendant was evidence of provocation, and there was evidence of provocation on the night of the murder.

During closing arguments, the prosecution argued that while defendant would understandably have been irritated by his encounter at the liquor store and his failure to find consolation with Akbar, the standard to be applied is a person of average disposition, and the "slight provocation" in this case was insufficient for voluntary manslaughter. The prosecution relied on the fact it took from four to six minutes for Akbar to die from asphyxiation. "During that entire time, the defendant is there and he is making that choice [to continue choking Akbar]. Each and every second of every minute that he applies that pressure, he is making the decisions that take away Miss Akbar's life."

### B.     *Discussion*

The trial court's determination whether evidence has sufficient relevance to be admitted is reviewed for abuse of discretion. (*People v. Sanders* (1995) 11 Cal.4th 475, 554–555.) "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's [due process] right to present a defense.' [Citation.] Although completely excluding evidence of an accused's defense theoretically could rise to [that] level, excluding defense evidence on a minor or subsidiary point does not . . . . Accordingly, absent such a complete exclusion, the proper

9

standard of review for erroneous exclusion of defense evidence is whether it is reasonably probable the jury would have reached a more favorable verdict had the evidence been admitted. (*People v. Fudge* (1995) 7 Cal.4th 1075, 1102-1104.)

Exclusion of defense evidence pursuant to Evidence Code section 352 ordinarily does not infringe on the defendant's due process right to present a defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 414.) Although section 352 must bow to a defendant's right to present evidence (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599), that principle only applies where the evidence has "significant probative value" and "does not mean the court must allow an unlimited inquiry into collateral matters . . . ." (*People v. Marshall* (1996) 13 Cal.4th 799, 836.) We will not disturb a trial court's exercise of discretion under section 352 unless the court "exercised its discretion '"in an arbitrary, capricious, or patently absurd manner."'" (*People v. Frye* (1998) 18 Cal.4th 894, 948.) When a trial court misapplies section 352 to exclude defense evidence, the applicable standard of prejudice is whether it is reasonably probable the verdict was affected. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)

Relevant here are the principles underlying the theory of provocation sufficient to reduce a charge of murder to voluntary manslaughter. "'A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.'" (*People v. Breverman* (1998) 19 Cal.4th 142, 153.) Malice is negated when the defendant acts in a "'"sudden quarrel or heat of passion."'" (*Id.* at pp. 153–154.) To show heat of passion for voluntary manslaughter, the defendant's reason must be "actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly and without due deliberation and reflection, and from this passion rather than from judgment."'" (*Id.* at p. 163.) The passion aroused can be any intense emotion other than revenge. (*Ibid*.) The provocation "need not occur instantaneously but may occur over a period of time." (*People v. Wharton*, *supra*, 53 Cal.3d at p. 569.) The key element is not the duration of the provocation but whether at the time of the act the defendant's reason

was so disturbed by some passion that an ordinary person would act rashly. (*Id*. at pp. 569–570.) However, the killing is not voluntary manslaughter "'if sufficient time elapsed between the provocation and the [killing] for passion to subside and reason to return.'" (*Breverman*, at p. 163.) Provocation must be affirmatively shown and is evaluated under an objective standard; i.e., the conduct must be sufficiently provocative that it would cause an average person to be so inflamed that he or she would lose reason and judgment. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1143–1144.)

In some cases, provocation may exist for second degree murder but be insufficient for manslaughter because second degree murder provocation is only determined under a subjective test, whereas voluntary manslaughter provocation must satisfy both a subjective and an objective test. That is, the existence of provocation to negate deliberation and premeditation and reduce the crime to second degree murder from first degree murder rests on a subjective evaluation of the defendant's actual state of mind. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295–1296.) In contrast, provocation that negates malice and reduces the crime to voluntary manslaughter also requires a determination that a reasonable person under like circumstances would have reacted with deadly passion. (*Ibid*.) Thus, a defendant who is subjectively precluded from deliberating because of provocation is guilty of second degree rather than first degree murder, even if a reasonable person would not have been so precluded. (*Ibid*.)

Here, defendant argues that the actual evidence of provocation produced at trial was minimal, consisting primarily of Akbar telling him that he was a "bitch" and had "bitch" written on his face. While this evidence would not be by itself sufficient to reduce murder to manslaughter, coupled with the additional evidence defendant intended to introduce, the jury would have found sufficient provocation. The prosecution argued vigorously that defendant committed first degree murder with deliberation and premeditation, and the coroner testified it would have taken four to six minutes for Akbar to die from asphyxiation, giving defendant sufficient time to consider what he was doing. Nonetheless, the jury rejected first degree murder. Therefore, he argues, the trial court's

11

exclusion of this evidence was critical to defendant's case and its omission was prejudicial, denying him his right to present a defense.

Respondent argues that there was sufficient other evidence of provocation such that defendant was not prevented from putting on a defense: Deputy Farr testified to the October 2006 domestic violence incident; after his arrest for Akbar's murder, defendant asserted Akbar had hit him in the face; in defendant's interview with Deputy Cooper, he told police that he and Akbar had a history of physical altercations; and the jury was instructed with provocation—with CALCRIM No. 570 explaining that provocation could occur over a period of time.

Here, we conclude that the trial court's exclusion of Gilmore's observations of how defendant and Akbar behaved with each other was prejudicial to defendant and deprived him of a defense. The October 2006 incident established that defendant and Akbar did not handle their disputes well, instead resorting to quarrelsome methods of reacting to each other; during the incident, Akbar hit defendant and threw food at him, causing defendant to hide in the bathroom, defendant claimed Akbar had hit him, and defendant pushed Akbar on the couch; defendant's statement to Deputy Cooper after his arrest established that Akbar was often rude and unpleasant to him. This one 2006 incident did not establish an ongoing pattern of provocation such that defendant was overcome by emotion when Akbar started abusing him about the incident at the liquor store. In order to establish an ongoing pattern of abuse between defendant and Akbar, and Gilmore's additional testimony was essential and crucial to establishing provocation such that a jury could have found, had prior abuse evidence been admitted, that defendant was guilty of the lesser offense of voluntary manslaughter.

## II.    Insufficient Evidence on Count 2

Defendant argues that insufficient evidence supports his conviction for sexual contact with human remains on count two because there was no independent evidence, aside from his extrajudicial statements, to establish the corpus delicti of the offense.

12

### A. Factual Background

Before the commencement of trial, defendant moved to exclude all statements defendant made to his sisters based on the corpus delicti rule. Defendant argued that there was insufficient evidence of the crime absent his statements. In so arguing, defendant relied on the fact that the autopsy report stated there was no trauma in the victim's genital area, yet she was found by police with her underwear down on one leg and in bed in her own home. The court pointed out that the corpus delicti rule only required the corroborating evidence to be "slight," and such evidence was present—even though the victim was in her own bed, her underwear around one leg was slight evidence of the fact she might have been sexually abused or molested. The court denied the motion.

At the conclusion of the prosecution case, defendant again moved to dismiss, arguing that there was no evidence beyond his statement to Deputy Cooper that intercourse with the victim after her death had occurred. The court stated that the medical examiner had testified that it was not clear whether sex occurred before or after the victim's death, and that there was sufficient evidence in corroboration, and denied the motion.

### B. Analysis

California adheres to the "corpus delicti" rule, under which the corpus delicti— essentially, the fact that a crime has been committed—cannot be proved based solely on extrajudicial statements of the defendant. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1169, 1173.) The elements of the corpus delicti are "(1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm." (*Jones v. Superior Court* (1979) 96 Cal.App.3d 390, 393.) "'The independent proof may be by circumstantial evidence [citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient. [Citations.]' [Citation.] To apply the rule, it is not necessary for the

13

independent evidence to establish that the defendant was the perpetrator. [Citations.]" (*People v. Wright* (1990) 52 Cal.3d 367, 404.)

"We reemphasize that the quantum of evidence the People must produce in order to satisfy the corpus delicti rule is quite modest; case law describes it as a 'slight or prima facie' showing. [Citations.] This minimal standard is better understood when we consider that the purpose of the corpus delicti rule is 'to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator.' [Citation.] As one court explained, 'Today's judicial retention of the rule reflects the continued fear that confessions may be the result of either improper police activity or the mental instability of the accused, and the recognition that juries are likely to accept confessions uncritically.' [Citation.] [¶] Viewed with this in mind, the low threshold that must be met before a defendant's own statements can be admitted against him makes sense; so long as there is some indication that the charged crime actually happened, we are satisfied that the accused is not admitting to a crime that never occurred." (*People v. Jennings* (1991) 53 Cal.3d 334, 368; see also *People v. Jones* (1998) 17 Cal.4th 279, 301–302.)

"The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*People v. Alvarez*, *supra*, 27 Cal.4th at p. 1171.)

Here, there is sufficient evidence corroborating defendant's statement of the corpus delicti. Police discovered Akbar lying in bed, partially clothed from the waist up; a wadded up piece of tissue paper was nearby; and there was a stain on the bedding. This

evidence is consistent with a sexual assault that Dr. Ribe opined could have occurred after death.

### III. *Brady* Evidence

Defendant argues that his conviction on count 1 must be reversed because the trial court failed to disclose evidence material to the defense that was relevant to the impeachment of Dr. Ribe, the coroner who testified at trial. He contends that without this withheld material, he was unable to effectively cross-examine Dr. Ribe and the error was prejudicial because his testimony concerning the amount of time it took for Akbar to die of asphyxiation was critical to his defense of provocation. Respondent argues the information was neither suppressed nor material: Dr. Ribe was the subject of the opinion in *People v. Salazar* (2005) 35 Cal.4th 1031, making the information available through due diligence; and the evidence was not material because defendant's own statements that he could have stopped choking Akbar at any time and he was tired of her conduct toward him provided the primary evidence against him on provocation.

#### A. *Factual Background*

Dr. Joanna Rice, with Dr. Ribe present, performed the autopsy and prepared the autopsy report. At trial, defendant expected that Dr. Rice would testify. Instead, defendant argued that when Dr. Ribe testified, his testimony differed from the autopsy report and he also testified to facts not in the autopsy report—for example, Dr. Ribe testified that the cause of death was asphyxiation, not neck trauma.[3]

---

[3] Defense counsel argued, "Dr. Ribe made statements that were contrary to the autopsy report that I had. He gave a cause of death that was different from the autopsy report that I had. . . . [¶] . . . It was part of my cross-examination to specifically say that asphyxiation was not included as a cause of death. And the . . . autopsy report [stated] the cause of death is neck trauma. [¶] I questioned Dr. Ribe about the fact that neck— that neck trauma did not match what he was saying. I asked him in detail whether he was aware at the time that he signed off on this autopsy report that it would be something used for trial and yet was saying a different cause of death . . . . [¶] For my entire preparation of this trial, I was confused by the neck trauma cause of death that was provided by Dr. Rice. Now knowing or having reason to believe, though I still don't

15

After the verdict, defense counsel learned that Dr. Ribe had been the subject of numerous investigations and that the prosecution had "an entire box worth of materials" related to these inquiries. Defendant made a motion for new trial, arguing the prosecution failed to disclose information that Dr. Ribe had been the subject of numerous investigations and inquiries, which information would have been imperative for defendant's effective cross-examination of Dr. Ribe on the cause of death of Akbar. The prosecution argued that Dr. Ribe's history was well documented in *People v. Salazar*, *supra*, 35 Cal.4th 1031, and the box of materials discussed in that case was available in the district attorney's office but those materials were no longer copied for defense counsel due to the widespread knowledge of Dr. Ribe. The information was not material because even if Dr. Ribe had been impeached with evidence of his prior conduct, Dr. Ribe's testimony merely corroborated defendant's own statement he strangled Akbar; therefore, it is not likely the impeachment evidence would have changed the jury's verdict.

The trial court denied the motion, finding that because Dr. Ribe was not the sole author of the autopsy report, and another medical examiner was present, the evidence was not material.

### B. Analysis

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.) This duty to disclose evidence favorable to the defense exists even though there has been no request by the accused (*United States v. Agurs* (1976) 427 U.S. 97, 107 [96 S.Ct. 2392, 49 L.Ed.2d 342]), the duty encompasses impeachment evidence as well as exculpatory evidence (*United States v. Bagley* (1985) 473 U.S. 667, 676 [105 S.Ct. 3375, 87 L.Ed.2d 481]),

have the specifics that Dr. Ribe changed his opinions, I think that that definitely impacted my cross-examination."

16

and that the duty extends even to evidence known only to police and not to the prosecutor (*Kyles v. Whitley* (1995) 514 U.S. 419, 438 [115 S.Ct. 1555, 131 L.Ed.2d 490]). Such evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (*Id*. at pp. 433–434.) In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." (*Kyles*, at p. 437; *In re Brown* (1998) 17 Cal.4th 873, 879.)

The *Brady* analysis requires a three-step process: (1) was the evidence favorable to the defendant, (2) was the evidence suppressed, and (3) was the evidence material. (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.) The suppression prong requires us to consider whether the evidence was "'suppressed' by the government." (*Id.* at p. 1048.) Although the prosecution may not withhold favorable and material evidence from the defense, neither does it have the duty to conduct the defendant's investigation for him. (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) If the material evidence is in a defendant's possession or is available to a defendant through the exercise of due diligence, then, at least as far as evidence is concerned, the defendant has all that is necessary to ensure a fair trial, even if the prosecution is not the source of the evidence. (*Salazar*, at p. 1049.) Accordingly, evidence is not suppressed unless the defendant was actually unaware of it and could not have discovered it "'by the exercise of reasonable diligence.'" (*Morrison*, at p. 715.) The materiality prong requires an evaluation of whether there is a reasonable probability, had the evidence been disclosed to the defense, the result would have been different. (*Salazar*, at p. 1050.) "'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citation]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony," [citations].'" (*Id*. at p. 1050.)

17

In *People v. Salazar*, *supra*, 35 Cal.4th 1031, the court discussed at length a *Brady* claim in another case, *People v. Wingfield* (Super. Ct. L.A. County, No. LA020636) (*Wingfield*). In *Wingfield*, the prosecution allegedly suppressed evidence[4] concerning a change in Dr. Ribe's testimony regarding the cause of the death of a two-year-old boy (Lance Helms) at the hands of his father's girlfriend, the defendant Eve Wingfield, in 1995. The child had been in the care of Wingfield all day until the father came home in the evening. She went out for about 25 minutes, and when she returned, the child was blue and did not appear to be breathing. (*Id.* at p. 1044.) Critical to the case against Wingfield was the time it took for the child to die from his injuries. Originally, Dr. Ribe testified the injuries could have been inflicted only 30 to 60 minutes before the child died, which focused attention on Winfield because she was with the child during that time. She told police she was gone only 10 minutes, instead of the 25 to 30 minutes she was actually gone, because she was afraid of the father, who had been abusive to her; Wingfield entered a plea of no contest to manslaughter. (*Id.* at pp. 1044–1045.) After Wingfield sought to withdraw her plea, the police reopened their investigation and interviewed Dr. Ribe, reevaluated the autopsy and determined that the child's estimated time of death was likely nearly instantaneously with the assault, but certainly within 30 minutes of the assault. Dr. Ribe did not concede that this original estimate was wrong, only that it was likely the child died nearer the shorter end of his time estimate. (*Id.* at p. 1046.) The net result of the police's follow-up investigation and Dr. Ribe's revaluation was that the child's father was charged with the child's murder. (*Id.* at p. 1046.)

In *Salazar*, *supra*, 35 Cal.4th 1031, the Ribe materials allegedly suppressed in *Wingfield* were described as a list of cases in which timelines were relevant, a list of cases where Dr. Ribe had changed his opinion regarding the time of death, and case transcripts. (*Id.* at p. 1041.) Although at the time of trial in *Salazar,* newspaper reports concerning

---

[4] The prosecution's information concerning Dr. Ribe included evidence of cases in which Dr. Ribe had changed his testimony and a "Ribe box[ ]" maintained at the district attorney's office. (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1052, fn. 8.)

18

Dr. Ribe's credibility were frequent because of the *Wingfield* case, *Salazar* did not determine whether the materials were suppressed in the case before it, instead resolving the matter on materiality. On that point, the court rejected the defendant's argument that Dr. Ribe's impeachment evidence in the hands of the prosecution was crucial because Dr. Ribe's trial testimony was the only evidence connecting him to the crime, finding numerous other expects testified to facts connecting defendant to the crime. (*Id.* at pp. 1050–1051.) Further, *Salazar* pointed out that "it is unlikely the follow-up investigation report in [the *Wingfield* case regarding] the Helms murder would even have been viewed as significant impeachment evidence in [this case because the] theory that Dr. Ribe shapes his testimony to fit the prosecution's case is neither the inevitable nor the most logical inference from the follow-up investigation report. As Dr. Ribe explained, his opinion concerning the Helms murder, in the main, remained consistent throughout. He merely shortened the long end of his estimate of the time of injury and loss of consciousness based on consultations with outside experts and closer examination of the injuries Lance had suffered—but neither of these factors indicates that Dr. Ribe was biased nor that Dr. Ribe's modification to his earlier opinion was inaccurate or unjustified. Although Dr. Ribe considered David Helms's history of abusive behavior in assessing 'whether the medical evidence tended to correlate or not correlate with that type of information' and (thus) whether his original opinion warranted a reexamination, Dr. Ribe did not rely on those facts in revising his opinion. Petitioner's attempt to focus the blame for the prosecution of Eve Wingfield entirely on Dr. Ribe also ignores the time estimates Dr. Ribe provided to police and the district attorney as well as at the preliminary hearing that implicated David Helms; the misleading and incomplete version of events provided by Eve Wingfield; and the incompetent investigation undertaken by the original investigating officer." (*Id.* at p. 1051.)

Here, although relevant to the issue of provocation on count 1, which we have reversed, we point out (and the respondent concedes) that the more prudent course was for the prosecution to disclose the impeachment evidence of Dr. Ribe, rather than

19

assuming the materials are well known to the defense bar. Defendant found out on the eve of trial that Dr. Ribe was going to testify. Thus, in spite of the fact that defendant allegedly could easily discover the evidence on his own because Dr. Ribe's propensity to change his opinions was broadly discussed in *People v. Salazar*, *supra*, 35 Cal.4th 1031 and the "Ribe box" of information on Dr. Ribe was purportedly well known to the local defense bar, we find that a discussion of Dr. Ribe in a published case is no substitute for disclosure of the underlying documents. Such disclosure would have permitted defendant to evaluate the evidence and would have allowed his counsel to shape cross-examination of Dr. Ribe in accordance with the Ribe materials. By assuming the Ribe materials were notorious, the prosecution side-stepped its obligation of disclosure and short-circuited defendant's ability to present his case. Thus, the better course of action is for the prosecution to turn over the materials on Dr. Ribe, and we expect that if there is a retrial of count 1, the prosecution will do so.

## IV. Correction of Abstract of Judgment

Both parties point out that the reporter's transcript reflects that at sentencing, the trial court imposed and stayed a $240 parole revocation fine (Pen. Code, § 1202.45) and a $240 restitution fine (Pen. Code, § 1202.4, subd. (b)). Nonetheless, the sentencing minute order and abstract of judgment indicate the court imposed these fines on each count for a total restitution fine of $480 and a parole revocation fine of $480.

We agree with the parties that the minute order and abstract of judgment must be corrected to conform to the trial court's oral pronouncement of judgment. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 864 [trial court's oral pronouncement controls where there is a conflict between the pronouncement and the minute order or abstract of judgment].)

20

## DISPOSITION

Defendant's conviction on count 1 is reversed, and his conviction on count 2 is affirmed. The trial court is directed to prepare a correct abstract of judgment to reflect that defendant was subjected to a single parole revocation fine of $240 and a single restitution fine of $240 on count 2. The trial court shall forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


JOHNSON, J.

We concur:


MALLANO, P. J.


CHANEY, J.

21